# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# HARRISONBURG DIVISION

| | | |
|---|---|---|
| POLLY JO HURDLE SAYLOR, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Civil Action No. 5:11cv035 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | By: Michael F. Urbanski |
| Commissioner of Social Security, | ) |     United States District Judge |
| | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION

This social security disability appeal is before the court for review of the Report and Recommendation issued in this case by the magistrate judge on January 23, 2012. In that Report and Recommendation, the magistrate judge concluded that the administrative law judge ("ALJ") mischaracterized the evidence concerning Polly Jo Hurdle Saylor's ("Saylor") functional limitations and activities of daily living, rendering his credibility determination flawed. Having carefully reviewed the entirety of the record, however, it is clear to the court that substantial evidence supports the ALJ's determination that Saylor is not disabled. As such, the magistrate judge's recommendation will be rejected and the Commissioner's decision affirmed.

## I.

This matter was referred to the magistrate judge for proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) on June 9, 2011. The parties filed cross motions for summary judgment and supporting memoranda and the magistrate judge issued his Report and Recommendation on January 23, 2012. Pursuant to 28 U.S.C. § 636(b)(1), the "court may accept, reject, or modify, in whole or in part, the findings and

recommendations made by the magistrate judge." Federal Rule of Civil Procedure 72(b) provides the parties with an opportunity to file written objections to the proposed findings and recommendations, but neither party filed objections in this case. Rule 72(b)(3) provides that the "district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." While the text of the rule is silent as to the obligation of the court if no objection is made, the advisory committee notes that "[w]hen no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Advisory Committee Notes to Fed. R. Civ. P. 72 (citing Campbell v. United States Dist. Court, 501 F.2d 196, 206 (9th Cir. 1974)). In Thomas v. Arn, 474 U.S. 140 (1985), the Supreme Court had occasion to address the issue, and stated as follows:

> The district judge has jurisdiction over the case at all times. He retains full authority to decide whether to refer a case to the magistrate, to review the magistrate's report, and to enter judgment. Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

474 U.S. at 154. Thus, even absent an objection, the court retains the ability to review sua sponte a magistrate judge's report and recommendation. The court believes that the particular facts of this case present an appropriate occasion to review the magistrate judge's Report and Recommendation notwithstanding the absence of an objection.

## II.

In his Report and Recommendation, the magistrate judge concluded that the ALJ erred by finding plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms not to be credible. The magistrate judge determined that the ALJ mischaracterized the

2

evidence regarding Saylor's functional limitations and daily activities, and found that the ALJ's assessment of plaintiff's physical abilities was clouded by plaintiff's ability to sit for several hours before and during the hearing. Report & Recommendation, Dkt. # 18, at 7. The magistrate judge acknowledged that there are inconsistencies in plaintiff's medical treatment records but found that the errors in the ALJ's analysis of plaintiff's statements "undermine the whole of the credibility assessment and necessitate remand for further review." Id. at 9. The court disagrees.

A.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard." Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a

3

reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

**B.**

Saylor argues, and the magistrate judge agrees, that the ALJ erroneously assessed Saylor's subjective complaints and found her not to be credible. However, allegations of pain and other subjective symptoms, without more, are insufficient to establish disability. Craig, 76 F.3d at 592. It is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. See Smith, 99 F.3d at 638. The ALJ is not required to accept Saylor's subjective allegation that she is disabled because of her pain, but rather must determine, through an examination of the objective medical record, whether she has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig, 76 F.3d at 592-93 (stating that objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers.") Then, the ALJ must determine whether Saylor's statements about her symptoms are credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not to interfere with those determinations. See Hatcher v. Sec'y of Health and Human Servs., 898 F.2d 21, 23 (4th Cir. 1989).

Having carefully reviewing the entire record, the court finds no reason to disturb the ALJ's credibility determination in this case. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th

4

Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). In considering Saylor's alleged symptoms, the ALJ followed the two step process outlined in Social Security Ruling 96-7p, finding first that her medically determinable impairments could reasonably be expected to cause her alleged symptoms, but ultimately determining that her statements concerning the intensity, persistence and limiting effects of these symptoms were not credible and lacked support and consistency with the other evidence of record. <u>See also</u> 20 C.F.R. § 404.1529. Substantial evidence supports this finding. The evidence of record simply does not substantiate the degree of limitation Saylor alleges.

Saylor testified that she suffers from migraine headaches lasting anywhere from three to ten or twelve days (R. 31), and that during that time she "crashes" for days:

> I don't even get up and go to the bathroom sometimes for 24, 48 hours. I may sleep for 72 hours. And I can't bend over, I can't bend down. I can't, I certainly can't drive. I can't watch television. I can't, you know, just pretty much out of it. I'm nauseous the whole time.

(R. 31.) With respect to her fibromyalgia pain, she testified:

> The pain sometimes is like I can't even, a cat can't step on my leg or the dog's tail, I can't stand for the dog's tail to touch me. I become weak, I'm exhausted, beyond exhaustion. I can't think clear. I have a hard time speaking. I don't remember things. It, I would say that it affects me and my family in almost everything that we do.

(R. 32.) She testified that she cannot stand for more than five to ten minutes before needing to change positions, but that walking "is a lot easier:"

> If I feel good, if my head's not pounding I can walk for an hour as long as there's [sic] isn't much of an incline. If there's much of an incline then my head will pound to where I can't breathe right. But if I don't feel good I can't, I can't walk up the steps and carry a laundry basket.

5

(R. 38-39.) On good days, Saylor stated she can lift "just about anything," on bad days, she cannot lift anything, and on average days, she can lift less than a gallon of milk. (R. 39.) As far as the frequency of the good and bad days, Saylor testified that she has good days "a couple times a month," on which she can get up, bathe, and do some dusting and mopping and unload the dishwasher. (R. 33.) She has bad days several times a week and "really, really bad days" where she cannot do anything—not even get dressed—four or five times a month. (R. 33.) Regarding the "middle days" in between the good and bad days, Saylor testified:

> I would say, I would compare it to being, like having a really bad flu, you know, I can get up and, and go get a cup of tea. And everything just exhausts me. I may be able to go out and walk about ten minutes with the dogs. I may be able to go to the grocery store but many times I've driven to the grocery store and by the time I get there and go to go into the grocery store I'm too tired and I have to go back out to the car.

(R. 34.) Saylor further testified to having a tremor that, when it is at its least, just looks like she is nervous, but when it is at its worst, which is "[a]t least 50 percent of the time," she cannot dial the phone or use a computer. (R. 39-40.)

The magistrate judge found that the ALJ had mischaracterized some of Saylor's statements concerning her level of activity and ignored the fact that Saylor's alleged ability to engage in activities varied based on her daily symptoms. The ALJ did not ignore this fact, however; he specifically discussed Saylor's testimony regarding the variance in her functioning between good and bad days. (R. 21.) Additionally, there do appear to be inconsistencies between Saylor's testimony and the evidence of record. For example, Saylor testified she has "bad days"[1] several times per week where she "just sleeps[s]" and "can't do anything." (R. 33.) Yet in her function report she indicated she prepares meals three to four times per week (R.103),

---

[1] These "bad days" do not include the "really, really bad days" Saylor claims to suffer from four to five times per month. (R. 33.)

6

spends time every evening with her husband, talks three to four times per week with her mother, and enjoys going to dinner with her parents and husband sometimes as often as twice a week. (R. 105.) The record further indicates that she worked in some capacity into 2005, well after her alleged onset date.[2] There is reference in an office note from 2004 to Saylor "making a trip out west next week to see her son" (R. 268), and another note suggests that Saylor should "consider volunteer work as [a] bridge to employment." (R. 270.) Although Saylor stated in her notes following a function report that she has had to use a wheelchair and a cane (R. 118), none of the medical evidence suggests either has been prescribed. There is ample support for the ALJ's credibility determination in this case. His characterization of the evidence does not require remand.

The magistrate judge asserts that the ALJ's assessment of Saylor's physical abilities was "clouded by his observation that plaintiff was able to sit for several hours before and during the hearing," noting plaintiff made clear that her ability to sit, walk, and stand "only were limited while suffering the effects of her impairments. . . ." Report & Recommendation, Dkt. # 18, at 7-8. The ALJ did remark in his decision that Saylor "acknowledged sitting for a few hours the day of her hearing," (R. 22), but he in no way relied exclusively on that observation in assessing her functional capacity. He looked instead to the medical evidence and correctly concluded that "the degree of severity alleged lacks support and consistency with the other evidence of record." (R. 22.)

---

[2] Saylor testified that she last worked as a park ranger in September 2005 (R. 28), although it is clear from the record that she actually ceased working as a park ranger in September 2002. (R. 94.) Saylor appears to have difficulty recalling dates (see, e.g., R. 90), and this was likely just a mistaken recollection. However, Saylor went on to testify that she in fact did work for her husband's business "on and off" until 2005. (R. 30.) A treatment note from May 2003 indicates Saylor "works at home" (R. 307), corroborating the fact that she was working after her alleged onset date.

7

The medical evidence fails support the extreme degree of limitation from which Saylor claims to suffer. The scope of plaintiff's treatment during the relevant period, on the whole, was quite limited. Aside from two visits to the emergency room,[3] Saylor was treated solely by her primary care physician, Dr. McNamara. The record contains office notes from Dr. McNamara dating from February 23, 2001 through June 13, 2007. Saylor often presented with rather routine complaints, such as sinusitis, asthma, upper chest discomfort (probably reflux), breast cysts, and a rash. To be sure, there are numerous references in Dr. McNamara's office notes to complaints of migraine headaches and fibromyalgia pain. However, there are few objective findings aside from trigger points, and the records primarily appear to document Saylor's alleged symptoms and medication management in an effort to control those symptoms. Saylor's treatment was routine and conservative, and Dr. McNamara's records reveal that the medications prescribed helped to alleviate Saylor's symptoms. There are multiple references to the frequency and intensity of her headaches being alleviated with Zomig, Mazalt and Topamax. (R. 277, 279, 280, 281, 283; see also R. 213.) For example, on December 19, 2002, a few months after her alleged onset date, Saylor reported her headaches had improved on a higher dose of Topamax, and while she still suffered three to four headaches per week, "they [were] never enough to bother her." (R. 276.)

---

[3] Saylor was admitted to Rockingham Memorial Hospital on January 26, 2003 after having overdosed on Topamax, Wellbutrin, and Tramadol. She was observed overnight in the intensive care unit where she remained stable, and a subsequent physical examination was unremarkable. She was discharged the following day after a psychiatric consultation by Dr. Marcum. (R. 189-93, 196-203.) Although discharge records indicate Saylor was well-known to Dr. Marcum and that he had treated her with medication management and supportive psychotherapy in the past year, her follow-up was somewhat episodic according to Dr. Marcum and there are no other treatment records from Dr. Marcum in the administrative record. (R. 201.) Saylor does not appear to have received ongoing psychiatric treatment after this hospitalization, except through her primary care physician, Dr. McNamara, who opined in 2007 that her mental status was within normal limits. (R. 257.) This appears to be the only episode of decompensation during the relevant period.

Saylor's second ER visit during the relevant period was in October, 2006, when she presented to the University of Virginia Health System with complaints of enlarged lymph nodes, headache and fatigue. (R. 230-55.) Studies of the lymph nodes showed no abnormalities, and Saylor declined to undergo a CT scan of her head and further labs against medical advice. Testing of her lymph nodes revealed benign findings.

Saylor presented to Dr. McNamara just three times in 2003. Two of those visits resulted from a migraine Saylor said had lasted five days; at the second visit a week later, Saylor reported the headache was less severe. (R. 272-73.) The third visit to Dr. McNamara in 2003 concerned a lump in her breast. (R. 274.) Dr. McNamara's five office notes from 2004 reference migraines only twice. (R. 268, 270.) Saylor complained of fibromyalgia and sleep disturbance in March of 2004 (R. 271), but in October reported that Cymbalta was helping desensitize her trigger points and improve her mood. (R. 268.) In November, Saylor again said the Cymbalta was working well overall (R. 267), but she appears to have changed her mind in December and reportedly "did not note Cymbalta helped at all." (R. 266.) None of Dr. McNamara's four office notes from 2005 mention headaches.[4] Saylor complained to Dr. McNamara of fibromyalgia pain in April and May of 2005, but the only other two records from this year, from June and July, involve allergic rhinitis and breast cysts and say nothing of fibromyalgia pain. (R. 262-65.) All three office notes from 2006 center around complaints of chest pain, likely reflux-related, and do not mention issues with headaches or fibromyalgia pain.[5] (R. 259-61.) In all of Dr. McNamara's notes, there is only one reference to a "mild tremor." (R. 267.)

On January 8, 2007, Dr. McNamara performed a disability evaluation. He noted some deficits in Saylor's range of motion, most significantly in the right rotation of the cervical spine and hip flexion, but otherwise his findings were within normal limits. In the comments section of the form, he noted: "She has documented [degenerative disc disease] and [degenerative joint disease] of her cervical spine. Otherwise she has severe fibromyalgia." (R. 258.) Dr. McNamara's findings on the mental status evaluation form were all within normal limits, and he

---

[4] At the top of the note from April 13, 2005 it reads "c/o pain, med, migraines, fibromyalgia" but nothing in the doctor's notes references migraines. (R. 265.)

[5] However, emergency room records from October 4, 2006 reveal that Saylor presented with complaints of enlarged lymph nodes and a headache that had lasted for eight days. (R. 230.)

noted that her diagnosed dissociated disorder with depression "usually occurs with severe prolonged headache." (R. 257.) Dr. McNamara did not opine as to Saylor's functional ability to perform work related activity.

Given this record, the court cannot say that the ALJ erred in finding Saylor's testimony as to the severity of her symptoms not to be credible. The medical evidence simply does not corroborate the degree of pain and limitation Saylor alleges she suffers. See Craig, 76 F.3d at 592-94. It is not the court's job to re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review is limited to determining whether substantial evidence supports the Commissioner's decision. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). In this case, it does.

For these same reasons, substantial evidence supports the ALJ's residual functional capacity ("RFC") assessment. The reviewing state agency physicians found that Saylor has the RFC to perform a full range of light work. (R. 309-15, 316-28.) No treating physician opined to the contrary as regards Saylor's functional capacity during the relevant period, and the medical evidence of record supports this assessment. The ALJ "carefully appraised the requirements of the claimant's former jobs and the medical evidence regarding the claimant's impairments and functional limitations and [ ] assessed how these limitations would affect her ability to meet the requirements of her former jobs."[6] (R. 23.) Given the vocational expert's testimony that Saylor's former jobs can be performed at the light level of exertion, the ALJ's finding that Saylor can perform her past relevant work is supported by substantial evidence.

---

[6] Saylor argues on brief that the ALJ failed to perform a function-by-function assessment of her ability to work. However, it is clear from the ALJ's decision that he did perform this assessment, even if he did not spell it out. Social Security Ruling 96-8p does not require the ALJ to produce such a detailed statement in writing. See, e.g., Davis v. Astrue, No. JKS09-2545, 2010 WL 5237850, at *5 (D. Md. Dec. 16, 2010) (citing SSR 96-8p, at *7).

## C.

Saylor also argues on appeal that the Appeals Council erred in finding the evidence from Dr. Gerwin that was submitted to the Appeals Council did not change the weight of the evidence of record. When deciding whether to grant review, the Appeals Council must consider evidence submitted to it, "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Dept. of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991) (en banc). Evidence is new if it is not duplicative or cumulative. Id. at 96. Evidence is material "if there is a reasonable possibility that the new evidence would have changed the outcome." Id. at 96. In this case, the Appeals Council considered Dr. Gerwin's 2008 records and the RFC evaluation he completed on June 19, 2009, which limits Saylor to less than sedentary work, and the Appeals Council concluded that this evidence did not provide a basis for changing the ALJ's decision as to disability.[7] When the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner. Wilkins, 953 F.2d at 96; see 20 C.F.R. § 404.981. The final decision of the Commissioner is then subject to judicial review. 42 U.S.C. § 405(g). The Fourth Circuit requires that reviewing courts consider the record as a whole, including the new evidence, in order to determine whether the Commissioner's decision is supported by substantial evidence. See Wilkins, 953 F.2d at 96. The court must determine whether there is a "reasonable possibility" that the interim evidence submitted to the Appeals Council and considered by it would have changed the outcome. Id. at 96.

There is no reasonable possibility that the evidence submitted by Dr. Gerwin would have changed the outcome in this case. Dr. Gerwin, a pain and rehabilitative medicine specialist, did

---

[7] "The Appeals Council need not explain its reasoning when denying review of an ALJ decision." Meyer v. Astrue, 662 F.3d 700, 702 (4th Cir. 2011).

11

not see Saylor until June 28, 2008, six months after her date last insured.[8] (R. 358.) His records reveal that Saylor's headaches had changed noticeably by that time. (R. 354.) While she still suffered from occasional headaches, Saylor reported they were not as intense as they once were and tended to last a few hours instead of days, such that she was able to decrease her prescriptions of Maxalt and Zomig. (R. 352-54.) Although she complained of body pain, she noted that there are "days when she wakes up and feels fantastic." (R. 255.) She began receiving trigger point injections, from which she noticed an "immediate increase in ROM" in her head. (R. 354.) Yet in June of 2009, Dr. Gerwin filled out an RFC evaluation, in which he opined that Saylor could not perform even sedentary work. (R. 361-70.) In addition to the fact that this RFC evaluation was completed a year and a half after her date last insured, there is no evidence in Dr. Gerwin's records to support the extreme limitations he places on Saylor's ability to work. Instead, his notes reveal that Saylor's headaches had improved and that she was getting relief from her fibromyalgia pain through medication and trigger point injections. As such, there is no reasonable possibility that this evidence would have changed the outcome of this case.

## III.

In sum, it is clear from the record that Saylor has not met her burden of establishing that she is disabled. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). Accordingly, the court cannot agree with the magistrate judge's finding that the ALJ's decision is not supported by substantial evidence. Remand is not appropriate given this record.

---

[8] To qualify for disability insurance benefits, plaintiff must establish that she became disabled prior to the expiration of her insured status, December 31, 2007. 20 C.F.R. § 404.131.

To that end, an Order will be entered rejecting the Report and Recommendation of the magistrate judge in its entirety and affirming the Commissioner's decision.

Entered: September 12, 2012

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge